## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DENISE K. GRAY,**

      **Plaintiff,**

                                     **Civil Action 2:09-cv-00362**

**vs.**                                 **Judge John D. Holschuh**

                                   **Magistrate Judge E. A. Preston Deavers**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

### REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Plaintiff, Denise K. Gray, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance benefits. This matter is before the Magistrate Judge for a report and recommendation on Plaintiff's Statement of Errors (Doc. 11), the Commissioner's Memorandum in Opposition (Doc. 14), and Plaintiff's Reply (Doc. 15).

Plaintiff Gray maintains that she became disabled on November 1, 2004, at age 37, due to Charcot-Marie-Tooth ("CMT") disease; restless leg syndrome; narcolepsy; and Epstein-Barr virus. (R. at 91.) On April 12, 2006, Plaintiff initially filed her application for disability insurance benefits, alleging that she had been disabled since November 1, 2004. (R. at 74-78.) The application was denied initially and upon reconsideration. (R. at 42-46, 48-50.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 54-55.)

On July 16, 2008, Administrative Law Judge Karl Alexander ("ALJ") held a hearing at which Plaintiff, represented by counsel, appeared and testified. (R. at 27-36.)  A vocational expert also testified. (R. at 36-40.)  On August 11, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. at 11-20.)  Further, the ALJ found that Plaintiff could not perform her previous work, but found that she retains the ability to perform work at limited light and sedentary exertional levels. (R. at 16.)  On March 19, 2009, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-4.)

Plaintiff then timely commenced the instant action.

## II.   PLAINTIFF'S TESTIMONY

Plaintiff was born April 24, 1968. (R. at 74.)  She has a high school education and past work experience as a cosmetologist. (R. at 92, 107-08.)

Plaintiff testified at the administrative hearing that she experienced difficulty walking due to unsteadiness, especially on uneven surfaces. (R. at 27.)  She wore braces just below her knees that totally surrounded her feet. (*Id.*)  She removed the braces once or twice a day to rest her feet. (R. at 28.)  Without the braces, her walk was unsteady, and she "couldn't walk a distance." (*Id.*)  With her braces, she could walk approximately a block and "stand for a while," but she had to lean against something or keep shifting because the pressure that is placed on her feet would cause throbbing pain. (R. at 28-29.)

Plaintiff also experienced numbness and weakness in her hands. (R. at 30.)  If she was not having a "good day," Plaintiff could not open a jar and had difficulty picking up coins on a table. (*Id.*)  Plaintiff defined a  "good  day," as a day in which she had "gotten enough rest,"

2

meaning she had not done "a whole lot the day before maybe or even before that."  (*Id.*)

Plaintiff testified that she could be up during the night due to restless leg syndrome.  (*Id.*)  She took an hour nap almost every day, even when she had a good night's sleep, because she was tired.  (R. at 31.)  She further testified that raising her arms above her head causes them to go numb.  (R. at 32.)  Her kneecap was deteriorating, and it had been dislocated.  (*Id.*)

Plaintiff testified that her CMT disease has gotten progressively worse since her diagnosis.[1]  (R. at 33.)  She has deformed feet, high arches, and hammer toes.  (*Id.*)  She pointed out that the type of braces she has required have gotten progressively more restrictive, from just above the ankle to her current point just below the knee.  (R. at 33-34.)  Her legs become numb if she sits for too long; she has to change positions all day long.  (R. at 34.)

Plaintiff does some household chores, such as laundry, cooking and cleaning, but her husband and children help her out around the house because she becomes exhausted and "can't do things."  (R. at 34-35.)  If she knows that she is going to do something on a certain day, such as attend her child's ball game, she makes sure that she ensures that she does not exert too much effort during the day.  (R. at 35.)

### III.    MEDICAL RECORDS

**A.    Melissa Gaffney, D.P.M.**

On May 16, 2001, Plaintiff saw Dr. Gaffney with complaints of pain along the plantar lateral borders of both feet and medial rear foot area for several years duration.  She also

---

[1]"Charcot-Marie-Tooth disease" is defined as "a group of inherited diseases of the peripheral nerves, also known as hereditary sensorimotor neuropathy, causing a gradually progressive weakness and wasting of the muscles of the legs and the lower part of the thighs." CONCISE MEDICAL DICTIONARY, Oxford University Press, 2010, http://www.oxfordreference.com/pub/views/hom.html.

reported that her feet had hurt since she was a teenager, and she frequently twisted her ankles. Dr. Gaffney noted that due to her severe Pes Cavus,[2] she was suspicious of a neurological disorder.  Given her strong family history, Dr. Gaffney believed that Plaintiff may have CMT disease.  She prescribed orthotics.  (R. at 159-60.)

An EMG taken on June 27, 2001, was abnormal, evidencing severe sensory motor polyneuropathy, consistent with CMT disease.  (R. at 145.)

In April 2003, Plaintiff complained that her orthotics were wearing out.  Dr. Gaffney reported that Plaintiff had a severe cavovarus deformity of the foot and ankle and rigid retracted hammertoe deformities, indicating excessive pressure along the lateral border of her feet, especially the right foot.  Plaintiff's gait was very oversupinated.  Dr. Gaffney assessed severe cavovarus foot deformity bilaterally due to CMT.  (R. at 163.)

By June 2003, Plaintiff received molded ankle-foot orthotics ("MAFOs").  (R. at 164.) She noted that she has had several adjustments but was slowly trying to get used to the braces. (*Id*.)  Plaintiff reported that she was able to wear them for 5 or 6 hours.  (R. at 164.)

In February 2004, because her MAFOs were cracked, Plaintiff received a prescription to correct the broken orthotics.  Dr. Gaffney noted that Plaintiff's cavovarus deformity was somewhat controlled with the MAFOs.  (R. at 169.)

In September 2004, Plaintiff reported her feet always hurt, but the braces helped significantly.  She had again developed cracks in her MAFOs and bursitis around a bony prominence on her right foot.  Dr. Gaffney diagnosed severe cavovarus deformity bilaterally

---

[2]"Pes Cavus" is defined as "an excessively arched foot, giving an unnaturally high instep."  CONCISE MEDICAL DICTIONARY, Oxford University Press, 2010, http://www.oxfordreference.com/pub/views/hom.html.

secondary to CMT, bursitis overlying the peroneal tubercle on the right, and cracks in both MAFOs.  Plaintiff received a cortisone injection for the bursitis.  (R. at  165.)

On November 14, 2004, Dr. Gaffney completed a certificate of medical necessity for lifetime custom-molded AFO bilateral orthotics.  (R. at 183.)  Dr. Gaffney reported that Plaintiff's prognosis was fair, and that the orthotics were medically necessary to prevent pain, ulcers, infection and surgery.  (*Id.*)

On December 5, 2005, Dr. Gaffney reported that Plaintiff's severe cavovarus deformity was worsening and that bilateral twisting of her feet was causing inversion despite bracing.  She had champagne bottle appearance of calf musculature secondary to CMT and reduced muscle strength.  Dr. Gaffney prescribed a new MAFO for more control.  (R. at 167.)  On December 30, 2005, Plaintiff was fitted for her bilateral custom solid AFOs.  (R. at 174.)

On January 5, 2006, Dr. Gaffney completed another certificate of medical necessity for lifetime custom molded AFO bilateral orthotics.  Dr. Gaffney reported that Plaintiff's diagnosis was CMT with severe equines and severe cavovarus foot and ankle bilaterally, and that prognosis was poor.  (R. at 181.)

On February 6, 2007, Plaintiff continued to complain of right foot pain.  She demonstrated decreased muscle strength with noted atrophy in the left leg.  Dr. Gaffney gave Plaintiff a cortisone injection.  (R. at 270.)

**B.      Srini Govindan, M.D.**

From June 2001 to October 2007, Dr. Govindan, a neurologist, treated Plaintiff for CMT, peripheral neuropathy, restless leg syndrome, narcolepsy and excessive daytime sleepiness.  (R. at 145-65, 236-43, 259-69, 280-82.)  Examinations generally revealed muscle atrophy, weakness,

and contracture in the upper extremities, and deformity of the ankle and subluxation in the lower extremity.  Plaintiff also had decreased sensation/weakness in all four extremities.  Throughout Dr. Govindan's treatment of Plaintiff, she prescribed multiple medications for Plaintiff, including Provigil for her sleep disorder, Mirapex for restless leg syndrome, Neurontin for paresthesias, Ritalin for daytime sleepiness, Adderall for narcolepsy and ADHD, and Darvocet for pain.  (*Id*.)

In May 2005, Dr. Govindan indicated no progression of her condition.  (R. at 158.)  Lab work performed on April 11, 2006, was positive for narcolepsy gene typing, and viral titer was positive for previous Epstein Barr infection.  (R. at 236.)  On February 28, 2007, another neurological examination of Plaintiff's cranial nerves, reflexes, coordination, and gait indicated persistent weakness, atrophy, and reflex abnormality due to her neuropathy.  (R. at 282.)

On February 14, 2008, Dr. Govindan reported no change in Plaintiff's muscle atrophy and weakness from peripheral neuropathy.  (R. at 283.)

**C.     William Padamadan, M.D.**

On July 20, 2006, Dr. Padamadan examined Plaintiff.  According to his report, Plaintiff presented with a hereditary disorder of CMT.  She reported that she had a dislocation of her right knee recently, for which she was given a brace.  Plaintiff's knee stability appeared satisfactory at the time of the exam.  Plaintiff had clubbed foot with mild atrophy of the calf muscles, expected with CMT.  On examination of the upper extremities, Plaintiff had good range of motion of the shoulders, elbows, wrists, and fingers; no clinical indications of arthropathy as seen by clubbing of the fingers or pitting off the nails or nodular osteoarthritis of the distal joints; the flexion of the fingers was normal up to the proximal palmar creases; Allen test was normal; and grip

strength was satisfactory. Examination of the lower extremities revealed atrophy of the calf muscles and clubbed foot on both feet; she had decreased range of motion of her ankle, especially for inversion and eversion. Dr. Padamadan opined that with the properly fitted AFO, she was able ambulate quite well. Dr. Padamadan concluded that Plaintiff was able to sit, stand, and walk; her upper extremity functions for reaching, handling, fine, and gross movements were intact; and her mental status was normal without any overt signs of anxiety or depression. Based upon clinical evaluation, Dr. Padamadan found that she was not a candidate for climbing poles and ladders, and balancing on beam. Dr. Padamadan concluded, however, that with proper fitting AFO, which Plaintiff had, she was quite functional. (R. at 244-50.)

**D.      Kamala Saxena, M.D.**

On August 6, 2006, Dr. Saxena, completed a physical residual functional capacity assessment. (R. at 251-58.) Dr. Saxena opined that Plaintiff could perform medium exertional work, she could never climb ladders, ropes, or scaffolds, and she could only occasionally climb ramps and stairs, and she should avoid exposure to hazards. Dr. Sabena noted Plaintiff's diagnosis of CMT, restless leg syndrome, and history of Epstein Barr infection. She further noted that Plaintiff had ankle foot orthotics on both feet, but otherwise, walked unassisted. Dr. Saxena concluded that Plaintiff was partially credible, but that the medical evidence did not support a finding of an impairment as severe as Plaintiff alleged. (R. at 251-58.)

**E.      Robert A. Caveney, M.D., F.A.C.S.**

On June 14, 2006, Plaintiff was given an immobilizer she dislocated her right knee. (R. at 309.) By June 27, 2006, she stated that her right knee was feeling better. (R. at 308.) On July 13, 2006, Dr. Caveney noted that Plaintiff had been in therapy and working on motion. (R. at

7

307.)  By August 3, 2006, Plaintiff indicated that her knee felt fine.  (R. at 306.)  On December 18, 2007, Plaintiff had a second subluxation of her right patella.  She was given a knee immobilizer, and she was to begin therapy.  (R. at 304-05.)  By January 1, 2008, Plaintiff indicated that her knee was feeling better, but that she had occasional "grinding."  Dr. Caveney noted that her range of motion was good. (R. at 303.)

**F.  Charles Derrow, M.D.**

On March 19, 2007, Dr. Derrow, completed a physical residual functional capacity assessment.  Dr. Derrow reported that Plaintiff had orthosis on both feet, but otherwise, she walked unassisted.  She had atrophy of the calf muscles, clubbed feet, and decreased range of motion of her ankle.  Dr. Derrow also reported that Plaintiff had full strength in her upper extremities.  Dr. Derrow opined that Plaintiff could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds.  Dr. Derrow further opined that Plaintiff would be able to stand/walk at least 2 hours in an 8-hour workday and could sit about 6 hours in an 8-hour workday.  Her push/pull was unlimited.  Like Dr. Saxina, Dr. Derrow concluded that Plaintiff was partially credible, but that the medical evidence did not support a finding of an impairment as severe as Plaintiff alleged.  (R. at 272-79.)

**G.  Hanger Prosthetics & Orthotics**

On June 4, 2007, when Plaintiff was evaluated for a lower limb orthotics, she had decreased strength and sensation with hand and finger dexterity.  Her strength and range of motion in her ankles was rated less than poor.  (R. at 297-302.)  On a March 31, 2008, adjustment appointment, it was noted that one foot seemed to be shifting and progressing laterally.  (R. at 285.)  On July 8, 2008, Plaintiff noted her feet were "getting worse" as they

rotated inward towards the varus, causing her AFOs to crack again.  (R. at 284.)

## IV.    VOCATIONAL EXPERT TESTIMONY

The Vocational Expert ("VE"), James Ganoe, classified Plaintiff's past employment as a cosmetologist as skilled and light.  (R. at 37.)  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's "age, educational background and work experience" with the following abilities and restrictions:

> would be able to perform a range of light work; would require a sit/stand option; could perform postural movements occasionally except could not balance or climb ladders, ropes, or scaffolds; should do all walking on level and even surfaces; should not be exposed to temperature extremes or workplace hazards; should work in a low stress environment with no production line type of pace or independent decision making responsibilities.

(R. at 37-38.)  The VE testified that, at the light exertional level, there were jobs as a ticket taker (95,000 nationally and 850 regionally).  (R. at 38.)  He further testified that, if the exertional level were reduced to sedentary, with the other limitations, there were jobs as a credit authorizor (79,700 nationally and 2,180 regionally).  (*Id*.)

Finally, the VE testified that the hypothetical individual would not be employable if the following limitations were added: required a one to one and one-half hour nap once a day, off work more than three days per month due to fatigue, and inability to use their hands.  (R. at 38-39.)

## V.    THE ADMINISTRATIVE DECISION

On August 11, 2008, the ALJ issued his Decision, which contained the following findings of fact and conclusions of law:

> 1.    The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act so as to be insured for such benefits throughout the

9

"period at issue" herein, i.e., since October 1, 2004.

\*     \*     \*

2.     The claimant has not engaged in "substantial gainful activity" at any time during the period at issue (20 CFR §§ 404.1520(b) and 404.1571 *et seq.*).

\*     \*     \*

3.     During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: Charcot-Marie-Tooth disease, with bilateral cavovarus foot deformity; history of restless leg syndrome; and history of right knee dislocation (20 CFR § 404.1520(c)).

\*     \*     \*

4.     During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No.4 (20 CFR §§ 404.1520(d), 404.1525 and 404.1526).

\*     \*     \*

5.     Throughout the period at issue, the claimant has had at least the residual functional capacity to perform, within a low stress environment, a range of work activity that: requires no more than a "light" level of physical exertion; affords the option to sit or stand; requires no balancing, no climbing of ladders, ropes or scaffolds, and no more than occasional performance of other postural movements (i.e., climbing ramps/stairs, crawling, crouching, kneeling or stooping); affords even, level surfaces for all required walking; entails no significant exposure to temperature extremes or to hazards (e.g., dangerous moving machinery, unprotected heights); and requires no production line type of pace or independent decision making responsibilities (20 CFR § 404.1520(e)).

\*     \*     \*

6.     Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of any "vocationally relevant" past work as a beautician/cosmetologist (20 CFR § 404.1565).

\*  \*  \*

7. The claimant throughout the period at issue is appropriately considered for decisional purposes as a "younger individual [age 18-44]" (20 CFR § 404.1563).

\*  \*  \*

8. The claimant has attained a "high school" education and is able to communicate in English (20 CFR § 404.1564).

\*  \*  \*

9. The claimant has a "skilled/semi-skilled" employment background but has acquired no particular work skills that are transferable to any job that has remained within her residual functional capacity to perform during the period at issue (Social Security Ruling 82-41, and 20 CFR § 404.1568 and Part 404, Subpart P, Appendix 2).

\*  \*  \*

10. Considering the claimant's age, level of education, work experience and prescribed residual functional capacity, she has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 404.1560(c) and 404.1566).

\*  \*  \*

11. The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since October 1, 2004 (20 CFR § 404.1520(g)).

(R. at 14-20.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

11

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C.
§ 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by
substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is
defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant
evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486
F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.
1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must
"'take into account whatever in the record fairly detracts from [the] weight'" of the
Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting
*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial
evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial
evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of
Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).
Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the
Commissioner will not be upheld where the SSA fails to follow its own regulations and where
that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"
*Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.
2007)).

## VII.  ANALYSIS

Plaintiff advances two arguments in support of her assertion that the decision of the
Commissioner denying benefits should be reversed. First, Plaintiff contends that the ALJ's
conclusion that Plaintiff's impairment does not meet or medically equal Listings 11.04 or 11.14

was incorrect.  (Pl.'s Stmt. of Errs. 9).  Second, Plaintiff asserts that the ALJ failed to fully and properly evaluate Plaintiff's credibility as to the extent of Plaintiff's pain and related symptoms and their impact on her ability to perform the functions of work.  (*Id*. at 11).  This Report and Recommendation addresses each argument separately.

**A.    Listings 11.04 and 11.14**

Plaintiff asserts that her diagnosed condition of CMT meets or equals the requirements of Listings 11.04 and 11.14.  The ALJ disagreed.  The undersigned concludes that substantial evidence supports the ALJ's determination.

The Commissioner has established a five-step sequential evaluation process for disability determinations.[3]  20 C.F.R. § 404.1520; *Hensley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009).  If the Commissioner determines that a claimant is or is not disabled at any step, the Commissioner

---

[3]Section 404.1520 sets forth the five steps as follows:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 404.1560(b).)

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 404.1560(c).)

20 C.F.R. § 404.1520(a)(4).

makes a determination or decision and does not proceed to the next step.  20 C.F.R. §

404.1520(a)(4).  If the claimant has a severe impairment, at the third step, the impairment is

compared with the Listing of Impairments, 20 C.F.R., Part 404, Subpart P, Appendix 1.  If the

impairment is listed or is medically equivalent to a listed impairment, the claimant is found

disabled and benefits are awarded. 20 C.F.R. § 404.1520(d).

A claimant's impairment must meet every element of a Listing before the Commissioner

may conclude that he or she is disabled at step three of the sequential evaluation process.  *See* 20

C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir.

1986).  The claimant  has the burden to prove that all of the elements are satisfied.  *King v. Sec'y*

*of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).  The regulations provide that in

making a medical equivalence determination, the Social Security Administration will "consider

the opinion given by one or more medical or psychological consultants designated by the

Commissioner."  20 C.F.R. § 404.1526(c).  Nevertheless, "[t]he burden of providing a . . . record

. . . complete and detailed enough to enable the Secretary to make a disability determination rests

with the claimant."  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.

1986).  It is not sufficient to come to close to meeting the conditions of a Listing.  *See, e.g.*,

*Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where

medical evidence "almost establishes a disability" under Listing).

A claimant meets the Section 11.14 Listing, peripheral neuropathies, if he or she

establishes that the impairment causes "disorganization of motor function as described in

11.04B, in spite of prescribed treatment."  20 C.F.R. pt. 404, subpt. P, App. 1 § 11.14.  The

Section 11.04B Listing requires "[s]ignificant and persistent disorganization of motor function in

14

two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait

and station (see 11.00C)."  20 C.F.R. pt. 404, subpt. P, App. 1 § 11.04B.  Section 11.00C

provides as follows:

> Persistent disorganization of motor function in the form of paresis or paralysis,
> tremor or other involuntary movements, ataxia and sensory disturbances (any or
> all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or
> peripheral nerve dysfunction) which occur singly or in various combinations,
> frequently provides the sole or partial basis for decision in cases of neurological
> impairment. The assessment of impairment depends on the degree of interference
> with locomotion and/or interference with the use of fingers, hands and arms.

20 C.F.R. pt. 404, subpt. P, App. 1 § 11.00C.

The ALJ, in evaluating Plaintiff's condition under Listings 11.04 and 11.14, concluded

that Plaintiff has not "evidenced 'significant and persistent disorganization of motor function in

two extremities' resulting in 'sustained disturbance of gross and dexterous movements, or gait

and station' of any such severity as is contemplated by those listings."  (R. at 16.)  Consistent

with his conclusion that Plaintiff's condition lacked the requisite severity, the ALJ remarked that

"the evidence indicates [Plaintiff] to be quite functional."  (*Id.*)

Plaintiff submits that the ALJ improperly based his decision on his own lay opinion, and

without the benefit of a medical expert at the hearing.  Plaintiff contends that the record contains

no medical opinion which expresses that her disorganization with motor function is not as severe

as the Listings contemplate.

Plaintiff, in taking issue with the lack of medical evidence regarding the severity of her

impairment, fails to consider that none of her treating physicians prepared a written opinion to

the effect that she met the requirements of, or medically equaled, the Listing.  The medical

evidence Plaintiff submitted took the form of treatment notes, forms and similar records rather

than actual opinions of her treating physicians regarding her condition.  (*See* R. at 146-243, 259-71, 280-316.)  Because the exhibits submitted by Plaintiff contain no equivalence opinion from any treating physician, the ALJ justifiably relied on the consultative examination performed by Dr. Padamadan (R. at 244-50), and the two state-agency reviewing physicians, Dr. Saxena and Dr. Derrow.  Both of these physicians considered Plaintiff's symptoms associated with CMT, as well as restless leg syndrome, and opined that Plaintiff could perform and sustain a range of medium and light work.  (R. at 251-58, 273-76.)  *Cf. Fletcher v. Comm'r of Soc. Sec.*, No. 99-5902, 2000 WL 687658 (6th Cir. May 19, 2000) (ALJ properly weighed the evidence from medical records and non-treating consultants where none of claimant's treating physicians prepared a written opinion or offered testimony); *Peebles v. Chater*, No. 95-5627, 1996 WL 229528, at *5 (6th Cir. May 6, 1996) ("[I]n the absence of any evidence from treating physicians . . . the ALJ was required to rely on the reports of the consulting physician.").

Moreover, "[t]he signature of a State agency medical or psychological consultant on a . . . [Disability Determination and Transmittal Form] . . . ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."  *Hicks v. Comm'r of Soc. Sec.*, No. 03-5507, 2004 WL 1687945, at *4 (6th Cir. July 27, 2004) (citing Soc. Sec. Rul. 96-6p, 61 Fed. Reg. 34, 466, 34,468 (July 2, 1996)).  Here, two Disability Determination and Transmittal Forms appearing in the current record each bear the signature of a qualified physician.  (R. at 42-43.) Under existing law, that "professional input" is sufficient to satisfy 20 C.F.R. § 404.1526(b). *See id.*

Accordingly, applying the deferential standard of review applicable to the ALJ's

16

decision, the undersigned concludes that the ALJ's no-impairment finding is not erroneous for

failure to obtain a medical expert as to the Listings 11.04B and 11.14 issue.

**B.      Evaluation of Plaintiff's Credibility**

Plaintiff next argues that the ALJ did not properly evaluate the credibility of her

symptoms.  The ALJ found Plaintiff's impairment-related allegations to be only partially

credible.  Within the context of this case, the undersigned will not disturb the ALJ's credibility

determination.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he

had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue*, 263 Fed. Appx.

469, 475 (6th Cir. 2008) (citing *Walters v.  Comm'r of Soc. Sec.*, 127 F.3d 525, 531); *Sullenger v.

Comm'r of Soc. Sec.*, 255 Fed.Appx. 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's

credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the

evidence, or decide questions of credibility" (citation omitted)).

This deference extends to an ALJ's credibility determinations "with respect to [a

claimant's] subjective complaints of pain."  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th

Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th

Cir.1987)).  In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir.

1986), the Court of Appeals for the Sixth Circuit established the following test for evaluating

complaints of disabling pain.  First, the Court must determine "whether there is objective

medical evidence of an underlying medical condition." If so, the Court must then

> examine: (1) whether objective medical evidence confirms the severity of the
> alleged pain arising from the condition; or (2) whether the objectively established
> medical condition is of such a severity that it can reasonably be expected to
> produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853.

Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.  The ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted).  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.  Furthermore, in assessing credibility, the ALJ may consider a variety of factors including "the location, duration, frequency, and intensity of the symptoms; . . . [and] the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms . . ." *Rogers*, 486 F.3d at 247.

In the instant case, the record is replete with objective medical evidence indicating that Plaintiff had medically determinable impairments during the relevant period.  The ALJ acknowledged these impairments, and further recognizes that these impairments "could reasonably be expected to produce some of the symptoms that [Plaintiff] has alleged."  (R. at 17.)  The ALJ determined, however, that Plaintiff had "significantly exaggerated the debilitating severity of her impairment-related symptoms and limitations in order to facilitate contingent secondary interests."  (*Id*.)  In making this credibility determination, the ALJ properly relied on the record evidence, including objective medical findings and Plaintiff's own statements about her daily activities.  *See* 20 C.F.R. § 404.1529(c)(2) (objective medical findings are useful in assessing the intensity and persistence of a claimant's symptoms) and 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms).

For example, as set forth above, the ALJ relied on the consultative examination performed by Dr. Padamadan, and the two state agency reviewing physicians, Dr. Saxena and Dr. Derrow.  These doctors, after considering that Plaintiff had atrophy of the calf muscles, clubbed feet, decreased range of motion of her ankle, and AFOs for both feet, all opined that Plaintiff's allegations were "partially credible," but that "[t]he medical evidence does not present as severe an impairment as the claimant is alleging."  (R. at 256, 277.)

Dr. Padaman's objective findings and medical opinion also provide support for the ALJ's credibility determination regarding Plaintiff's subjective complaints of pain.  Dr. Padaman found that Plaintiff had good range of motion of the shoulders, elbows, wrists and fingers.  (R. at 246.) He reported that Plaintiff's "flexion of the fingers was normal up to the proximal palmar creases" and that her "grip strength was satisfactory."  (*Id*.)  In the lower extremities, despite atrophy of the calf muscles, clubbed feet, and decreased ankle motion, Dr. Padaman indicated that, "with the properly fitted AFO[s], [Plaintiff] was able to function quite well for ambulation."  (*Id*.)

Finally, the ALJ found that Plaintiff's statements regarding her varied activities contradict her allegations concerning the intensity, duration, and limiting effects of her symptoms.  (R. at 18.)  The ALJ noted that Plaintiff continues to make lunches for the family, get the children off to school, cook meals, do laundry and other chores, go on walks, drive, and shop.  (*Id*.; R. at 96-98.)  The ALJ also noted that, in a June 2007 medical record, Plaintiff was indicated to be "an 'active' mother of three."  (R. at 18) (citing a notation by the practitioner who evaluated her for AFOs (R. at 297.)).

Based upon the foregoing, the undersigned finds that the ALJ's assessment of Plaintiff's credibility was based on consideration of the entire record and is supported by substantial

evidence. Accordingly, applying the applicable deferential standard of review, the undersigned concludes that the ALJ's credibility determination was not erroneous.

## VIII. CONCLUSION

From a review of the record as a whole, the undersigned concludes that there is substantial evidence supporting the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner of Social Security's decision be **AFFIRMED.**

## IX. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate

review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


June 8, 2010                                      /s/ *Elizabeth A. Preston Deavers*
                                              Elizabeth A. Preston Deavers
                                              United States Magistrate Judge

21